**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BELINDA MYERS<br>1243 Half Street SW<br>Washington, DC 20024<br><br>and<br><br>WANDA THOMAS<br>1244 Howison Place SW<br>Washington, DC 20024<br><br>   *Plaintiffs*,<br> v.<br><br>DISTRICT OF COLUMBIA HOUSING AUTHORITY<br>1133 North Capitol Street NE<br>Washington, DC 20002<br><br>and<br><br>TIFAQUR QUANTAY OLIVER, in his individual capacity<br>161 Forrester Street SW<br>Washington, DC 20032<br><br>   *Defendants*. | Case No. 1:20-cv-00700 |

**COMPLAINT AND JURY DEMAND**

**NATURE OF THE ACTION**

1. Plaintiffs Belinda Myers and Wanda Thomas (collectively, "Plaintiffs") bring this civil rights action pursuant to the federal Fair Housing Act ("FHA"), 42 U.S.C. §§ 3604 and 3617, and the Equal Protection Clause of the Fourteenth Amendment through 42 U.S.C. § 1983 to remedy discrimination on the basis of sex by Defendants District of Columbia Housing Authority ("DCHA") and DCHA property manager Tifaqur Quantay Oliver (collectively,

1

"Defendants"). Plaintiffs seek declaratory judgment, injunctive relief, and damages for Defendants' quid pro quo and hostile environment harassment of Plaintiffs on the basis of sex.

2. For at least a decade, Mr. Oliver has leveraged his power as a property manager at DCHA to identify and prey upon female tenants in desperate situations by repeatedly badgering them to perform sexual favors, conditioning resolution of pending eviction proceedings or approval of home repairs on female tenants having sex with him, and offering money to DCHA tenants in exchange for sex.

3. Mr. Oliver sexually harassed both Plaintiffs in certain similar ways: when they were behind on their rent or otherwise in danger of being evicted, he targeted them and pressured them into accepting his assistance in exchange for sex. Mr. Oliver propositioned these women when he encountered them alone, often using vulgar language, invading their personal space, and attempting to lure them to hotels or casinos to have sex. Knowing the women relied on him for maintenance and repairs to their units, Mr. Oliver repeatedly summoned them to the rental office to "come see him," in an effort to isolate them and proposition them.

4. On multiple occasions, with multiple women, Mr. Oliver both explicitly and implicitly offered material housing benefits to DCHA tenants in exchange for sex. He claimed he could help delay or prevent eviction proceedings if tenants would sleep with him, and he promised to approve needed housing repairs in exchange for sex.

5. Mr. Oliver refused to take no for an answer; he persisted with these advances and offers for years, even after they had been repeatedly and unmistakably rejected.

6. Mr. Oliver's unwanted advances left Plaintiffs feeling unsafe and uneasy in their own homes and neighborhoods and in routine interactions with DCHA. They changed their living habits in multiple and inconvenient ways just to avoid having contact with Mr. Oliver.

7. On information and belief, Mr. Oliver's harassment was not limited to Ms. Thomas and Ms. Myers; he similarly targeted other women for harassment.

8. Mr. Oliver took these actions within the scope of authority granted to him by DCHA, and he was aided in his sexual harassment by the authority, status, and power granted to him by DCHA. Mr. Oliver acted under the color of state law, as the power extended to him by DCHA constituted state authority.

9. From the outset of Mr. Oliver's harassment and continuing for more than a year, Ms. Thomas repeatedly informed various DCHA employees of Mr. Oliver's harassment, but no DCHA employee acted to remedy the situation.  Mr. Oliver remained as Ms. Thomas's property manager.

10. Through their unlawful and discriminatory actions, Defendants have violated Plaintiffs' rights to be free from discrimination on the basis of sex.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), 28 U.S.C. § 2201, and 42 U.S.C. § 3613(a).

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District and because the Defendants conduct their business in this District.

## PARTIES

13. Plaintiff Belinda Myers is a resident of Washington, D.C. She previously lived at Benning Terrace and currently lives at James Creek, two properties managed by DCHA.

14. Plaintiff Wanda Thomas is a resident of Washington, D.C. and she lives at James Creek, a property managed by DCHA.

15. Quantay Oliver is a current or former employee of DCHA, who was paid wages to act as the property manager at Benning Terrace and James Creek during the time period covered by this Complaint.

16. As property manager, Mr. Oliver was charged with managing operations at his assigned properties. He handled delinquent accounts, managed home and property repairs, and maintained relationships with residents. By his own account, Mr. Oliver was able to influence eviction proceedings at his properties.

17. Defendant DCHA is a state-chartered corporate body established pursuant to D.C. Code § 6-202. It provides, among other things, public housing for people in Washington, D.C. It is organized and/or conducts business in Washington, D.C., and it is an "instrumentality of the District government." D.C. Mun. Regs. Tit. 14 § 7101.

18. DCHA operates the Benning Terrace and James Creek properties, and employed or employs Mr. Oliver as a property manager.

19. As an employee of a government agency, Mr. Oliver was given power by virtue of state law. All of Mr. Oliver's actions described below were made while he was working in this capacity as an employee of a government agency and wielding the power of the state, and thus were all made under color of state law.

20. In acting or omitting to act as alleged herein, Defendant DCHA was acting through its employees and/or agents and is liable on the basis of the acts and omissions of their employees and/or agents.

21. In acting or omitting to act as alleged herein, each employee or officer of Defendant DCHA—including, but not limited to, Mr. Oliver—was acting within the course and scope of their actual or apparent authority pursuant to such agencies, or the alleged acts or

omissions of each employee or officer was subsequently ratified and adopted by DCHA as principal.

22. Specifically, in all acts described below, DCHA, by virtue of its employment relationship with Mr. Oliver, authorized him to act on DCHA's behalf in its management of its residents, its properties, and its maintenance thereof. Furthermore, DCHA had the power and authority to control Mr. Oliver's actions and performance of tasks pursuant to all of his work activities. Mr. Oliver's authority and status as DCHA's property manager enabled the harassment described below.

**FACTUAL BACKGROUND**

23. Washington, D.C. is one of the most expensive rental housing markets in the United States. Low-rent housing in D.C. and its surrounding areas is limited, and demand for such housing is high. Public housing is one of the only avenues by which low-income families can find and maintain housing in D.C.

24. DCHA owns and manages 56 public housing properties, providing much of the affordable housing stock in the District. Residents of DCHA's public housing properties are only required to pay 30 percent of their income as rent. DCHA's properties are thus in extraordinarily high demand. According to its website, "there are many more DC families looking for affordable housing than available housing. That's why there are more than 25,000 people currently on the Waiting List for all the DCHA housing programs."

25. DCHA's housing waiting list is so long that it is currently closed to new applicants. Those on the list can wait for years for an opportunity to live at one of DCHA's properties. Accordingly, losing one's spot in DCHA's public housing program can have long-term consequences.

26. Ms. Thomas and Ms. Myers each waited years for a spot in a DCHA property.

**_Belinda Myers_**

27. Belinda Myers is a 38-year-old Black woman who has lived at DCHA housing for over fifteen years, first at Benning Terrace and then at James Creek.

28. Mr. Oliver was the property manager for Ms. Myers at both of these locations.

29. As property manager, Mr. Oliver was the DCHA employee that residents would contact in order to request repairs or inquire as to the status of pending repairs.

30. Once Mr. Oliver observed that Ms. Myers's relationship with her longtime boyfriend began to deteriorate in or around 2011, Mr. Oliver began suggestively inquiring as to the whereabouts of her boyfriend and making other advances toward her.

31. For example, on one occasion Ms. Myers went to the rental office to request Mr. Oliver's assistance with a home repair.

32. Mr. Oliver responded that in order to process the repair request, he needed to verify what needed to be fixed. Under this pretense, Mr. Oliver walked back with Ms. Myers to her home. As Ms. Myers walked up the steps to the front door, he walked closely behind her and said something to the effect of, "I heard you're supposed to have that good shit." Ms. Myers, offended, asked him what he meant. Mr. Oliver repeated himself, this time reaching for her buttocks.

33. At that moment, one of Ms. Myers's children opened the front door to the house and Mr. Oliver was forced to stop.

34. Ms. Myers understood from Mr. Oliver's gesture and statements that he was suggesting she was sexually skilled or otherwise speaking about her in a sexual manner. Ms. Myers was shocked, disturbed, and upset by Mr. Oliver's gesture and comments, as she knew

that she would have to continue to rely on him for ongoing property maintenance and other interactions with DCHA.

35. The next time Ms. Myers saw Mr. Oliver, a couple of weeks later, she was standing ten feet from her home and was walking to the bus stop. Mr. Oliver got very close to Ms. Myers's face—just inches away—and asked when the two were going to "link up." Ms. Myers put her earphones in and walked away. Ms. Myers understood from Mr. Oliver's demeanor and statement that he wanted to have sex with her.

36. Mr. Oliver's willingness to harass Ms. Myers while conducting his official duties left her frightened that she could be evicted from her home or be otherwise penalized for complaining or rejecting him.

37. Subsequently, Ms. Myers took measures to avoid Mr. Oliver when going about her daily business. Mr. Oliver frequently walked around the property. Fearful of being alone with him, she looked out of the windows before she left the home, and would sneak out of the back door if Mr. Oliver was near the front.

38. On multiple occasions, Ms. Myers delayed completing chores like grocery shopping or laundry if Mr. Oliver was around, instead choosing to stay inside her home to avoid him.

39. When Ms. Myers had to visit the Benning Terrace rental office to request repairs or otherwise seek assistance, she made a point of entering through the side entrance, where she could see who was inside before stepping inside the building. If she saw that no one else was in the office aside from Mr. Oliver, she would leave and come back later to avoid being alone with him. Because of Mr. Oliver's harassment, Ms. Myers felt that she could no longer freely access the rental office.

40. Having developed a careful system to evade Mr. Oliver, Ms. Myers managed to avoid one-on-one situations with him until early 2013, after she moved from Benning Terrace to James Creek.

41. By then, Ms. Myers had begun withholding rent, as her new home needed several significant repairs. Having no other option, Ms. Myers went to the James Creek rental office to ask Mr. Oliver about the repairs. Mr. Oliver, knowing Ms. Myers was behind on her rent, responded to Ms. Myers's request for repairs by telling her that he could pay her $150 to sleep with him. Ms. Myers told him she was not interested. Many of the needed repairs were never completed.

42. Ms. Myers understood Mr. Oliver to be offering her money that she could use to catch up on rent or pay for repairs in exchange for sex. Mr. Oliver only knew that Ms. Myers was behind on her rent because of his role as a DCHA property manager.

43. Despite Ms. Myers making clear that she did not welcome Mr. Oliver's sexual advances, he continued to regularly push Ms. Myers to have sex with him.

44. On approximately thirty separate occasions—in the rental office, on the neighborhood streets, at a nearby liquor store—he offered money in exchange for sex, pressured her to "link up" or "meet up," or otherwise harassed her. He pestered her to spend a night in casinos or hotels and have sex with him, saying he had "points" he could use to secure a private room. Sometimes he asked Ms. Myers to name a price that he could pay for sex. Each time, Ms. Myers told him she was not interested.

45. Mr. Oliver would make up excuses to come to Ms. Myers's home, hoping to catch her alone.

46. Though Ms. Myers rejected this harassment on each and every occasion, Mr. Oliver was unyielding—he even warned her to "stop running scared."

47. Ms. Myers attempted to avoid Mr. Oliver as much as she could, but it was more difficult at the James Creek property. Ms. Myers needed to make repair requests, and the layout of the James Creek rental office did not allow her to determine whether Mr. Oliver was alone before entering the office.

48. In or around November 2016, Ms. Myers asked Darlene Eddy, a DCHA employee in the rental office, to begin taking her rental payments directly out of her account so she could limit her contact with the rental office.

49. In further effort to avoid contact with Mr. Oliver due to his harassment, when Ms. Myers was forced to call the rental office, she would first dial *67 to block the caller ID so Mr. Oliver would not have easy access to her telephone number and would be less likely to attempt to call her back. She stressed about whether her kids might accidentally break something that would force her to have to interact with the rental office.

50. During this time, as Ms. Myers was avoiding Mr. Oliver for fear of additional sexual overtures, Ms. Myers's home fell into gross disrepair. There were holes in the kitchen floor large enough to see the ground beneath the home and an active leak had left the drywall behind the washing machine riddled with mold and mildew.

51. Ms. Myers's son suffered from asthma, and his pediatrician advised DCHA in a letter dated March 14, 2018 that the mold was exacerbating his condition and asked DCHA to remove all existing mold and water damage.

52. Ms. Myers made numerous efforts to get these and other problems with her home repaired. Frustrated with the lack of progress, Ms. Myers continued to withhold payment of rent.

DCHA threatened eviction, and Ms. Myers was forced to work out an agreement with Mr. Oliver to remain in her home.

53.  Ms. Myers met Mr. Oliver upstairs in the rental office to discuss her back rent. Ms. Eddy was working downstairs. While attempting to work on the agreement that would keep her in her home, Mr. Oliver pressured Ms. Myers into accepting an exchange, suggesting that he could keep DCHA off her back if she slept with him.

54.  Ms. Myers understood that Mr. Oliver was offering to help her delay or avoid eviction if she would have sex with him. Ms. Myers rejected Mr. Oliver's quid pro quo offer. Feeling humiliated and embarrassed, she left the rental office immediately.

55.  That wasn't the only time Mr. Oliver asked Ms. Myers to sleep with him in order to obtain his assistance or cooperation in addressing her housing needs. When Ms. Myers was struggling to get much-needed repairs done, she called the rental office and, finding no one else available, ended up speaking with Mr. Oliver about the repairs. He arrived at her home to inspect the property. While inside, Mr. Oliver said, suggested that if she slept with him, he would send someone to do the repairs. Ms. Myers rejected him once more, and Mr. Oliver left.

56.  Ms. Myers consistently rejected Mr. Oliver's quid pro quo requests to exchange sex for assistance with repairs. Many of the repairs Ms. Myers requested were not completed.

57.   In addition to quid pro quo requests, Mr. Oliver also made vulgar comments and even physically assaulted Ms. Myers by attempting to grab her genitalia. On one occasion, Mr. Oliver called Ms. Myers to the rental office while Ms. Eddy was out. Ms. Myers arrived and approached to see the documents he was showing her.

58. Mr. Oliver walked towards her and got very close to her. When he was just inches away, he reached for her genitalia, commenting he wanted to see how "fat" her "pussy" was and referencing the size of his penis.

59. Ms. Myers backed away frightened, and started toward the rental office door. Mr. Oliver followed her to the door, asking her why she was scared, and insisting it was fine because nobody else was in the rental office and he could lock the door.

60. Ms. Myers rejected him again and fled the rental office.

61. This incident left Ms. Myers shocked, humiliated, and scared for her safety. She knew that Mr. Oliver was willing to use his size to his advantage as he continued to pressure her into a sexual relationship that she had made clear she did not want. She was nervous and apprehensive that due to her ongoing repair needs, she would be forced to continue enduring Mr. Oliver's aggressive sexual advances.

62. Ms. Myers continues to be shocked, stressed, frightened, traumatized, and humiliated by Mr. Oliver's persistent, aggressive harassment. It has caused her to feel depressed and worried about Mr. Oliver's next act of harassment and the consequences for her housing. She has been embarrassed by his vulgar and explicit language, and she has been confused as to why he has targeted her for such harassment.

63. Through his actions, Mr. Oliver created a hostile housing environment for Ms. Myers that she experienced from 2011 until Mr. Oliver was no longer serving as the property manager at James Creek in 2018. His incessant, aggressive advances were clearly unwelcome, and were repeatedly rejected by Ms. Myers. His harassment was severe and pervasive. It involved vulgar, explicit language, attempts to touch Ms. Myers's buttocks and vagina, and multiple sexual propositions, and continued for years. The harassment affected Ms. Myers's use

11

and enjoyment of her home. Ms. Myers lived in fear of harassment. Mr. Oliver's conduct interfered with her ability to request and obtain home repairs, and to walk freely around her property and neighborhood, and to freely access the rental office.

64. Mr. Oliver's offers to provide benefits (e.g., repairs, avoidance of eviction) in exchange for sex all constitute quid pro quo sexual harassment. These were unwelcome and nonconsensual requests to have sex in exchange for both the continued rental of her home and to enjoy the services that she is entitled to as a DCHA tenant.

<u>**Wanda Thomas**</u>

65. Wanda Thomas is a 48-year old Black woman. She has lived in DCHA housing for 10 years. From approximately 2010 to present, Ms. Thomas has resided in James Creek.

66. Mr. Oliver was the property manager for James Creek. In or around Fall 2017, Mr. Oliver approached Ms. Thomas to proposition her for sex after learning that she faced possible eviction proceedings.

67. Ms. Thomas was taking a class with DCHA's Workforce Development Initiative at the Southwest Family Enhancement & Career Center at 203 N Street SW.

68. One morning before class, Mr. Oliver stopped her just in front of the building that houses the Career Center. He walked up close to Ms. Thomas, suggested that she might soon face eviction proceedings, and said he could help if she had sex with him.

69. Ms. Thomas rejected him angrily, but he persisted. Only after Ms. Thomas yelled loudly did Mr. Oliver finally walk away.

70. Ms. Thomas—flustered, furious, and humiliated—walked into the Career Center and immediately spoke to DCHA staff about Mr. Oliver's harassment.

71. Mr. Oliver targeted Ms. Thomas because, using the resources available to him as a DCHA property manager, he had discovered that she was in danger of being evicted. Mr. Oliver referenced this threat of eviction in an attempt to coerce Ms. Thomas to have sex with him.

72. Mr. Oliver's conduct left Ms. Thomas nervous, angry, and afraid that her refusal to succumb to his advances could leave her more vulnerable and ultimately without access to housing.

73. In the ensuing months, Mr. Oliver repeatedly pushed Ms. Thomas to have sex with him. He frequently harassed her—making comments typically three or four times a week.

74. His advances were often vulgar and explicit, such as demanding to see her "fat pussy." He commented on her appearance, and how she met his standards for how he wanted his women to look. Mr. Oliver also repeatedly told Ms. Thomas that he had hotel points that he could use to rent a room that they could use to have sex.

75. On one occasion, Ms. Thomas was walking to get takeout food from a neighborhood restaurant, when she passed Mr. Oliver standing outside the rental office. As Ms. Thomas walked by, he pressured her to have sex with him in the rental office, commenting about how he could put a sign up and tell the other DCHA staff member in the office to take a break.

76. Mr. Oliver also pressed Ms. Thomas to visit him in the rental office. But once there it would become apparent to Ms. Thomas that Mr. Oliver actually had no professional reason to need her at the office. Feeling she had been lured to the rental office under false pretenses, Ms. Thomas stopped responding to these requests.

77. Other times, he would stalk the area in front of her home, waiting for her to come outside. Ms. Thomas tried to avoid Mr. Oliver. When she saw him outside her home she would choose not to leave the house to visit friends or run errands.

78. Mr. Oliver's harassment continued until Summer 2018 when he was reassigned away from James Creek.

79. Beginning in Fall 2017, Ms. Thomas continuously reported Mr. Oliver's harassment to various DCHA officials—approximately 20 different DCHA employees in all. Though some employees would verbally express sympathy for her plight, none stopped the harassment, held Mr. Oliver accountable, or helped protect Ms. Thomas from Mr. Oliver's advances.

80. Mr. Oliver's harassment caused Ms. Thomas to stop going to the rental office for assistance with her property. She stopped volunteering at James Creek events and would call family or friends to help with property repairs instead of the rental office. She began taking different, circuitous routes around the property to try to avoid passing the rental office or running into Mr. Oliver. When she saw him outside her window, she avoided leaving the house. If she saw him coming down the street, she would backtrack and go a different way to avoid being harassed. She felt unsafe in her own home.

81. Mr. Oliver's harassment caused Ms. Thomas to feel demoralized, traumatized, angry, and depressed. His vulgar and explicit language made her feel dirty, and she was stressed by trying to understand why he had done this to her. She was also scared, as she did not know where she would live if her rejection of Mr. Oliver's advances resulted in her eviction.

82. Mr. Oliver created a hostile housing environment for Ms. Thomas that she endured from Fall 2017 until Mr. Oliver was no longer serving as the property manager at James Creek in 2018.

83. His incessant, aggressive advances were clearly unwelcome, and were repeatedly rejected by Ms. Thomas. His harassment was severe and pervasive. It included vulgar, explicit language and repeated attempts to coerce Ms. Thomas into sex over a period of months. The harassment affected Ms. Thomas's use and enjoyment of her home. She lived in fear of harassment. Mr. Oliver's conduct interfered with her ability to request and obtain home repairs, to walk freely around her property and neighborhood, and to freely access the rental office.

84. Mr. Oliver's offer to delay or prevent Ms. Thomas's eviction proceedings in exchange for sex constitutes quid pro quo sexual harassment. It was an unwelcome request to have sex in exchange for the continued rental of her home.

## INJURY TO PLAINTIFFS

85. As a direct, proximate, and foreseeable result of Defendants' discriminatory practices described above, Plaintiffs have suffered, and continue to suffer, irreparable loss and injury, including, but not limited to, economic losses, injury to reputation, humiliation, emotional distress, loss of housing opportunities, and the deprivation of their housing and civil rights.

86. Defendants' unlawful actions as described herein were, and remain, intentional, willful and knowing, and/or have been, and are, implemented with callous and reckless disregard for Plaintiffs' legal rights.

## CAUSES OF ACTION

### COUNT ONE

**Violation of the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*
(All Plaintiffs Against All Defendants)**

87. Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 to 86 above.

88. Defendants' conduct, through their actions and those of their agents as described herein, constitutes quid pro quo harassment and hostile environment harassment.

89. Defendants' conduct, as described above, violates multiple provisions of the Fair Housing Act. Specifically, Defendants' sexual harassment constitutes:

   a. A denial of housing or making housing unavailable because of sex, in violation of Section 804(a) of the FHA, 42 U.S.C. § 3604(a);

   b. Discrimination in the terms, conditions, or privileges of the rental of dwellings, or in the provision of services or facilities in connection therewith, because of sex, in violation of Section 804(b) of the FHA, 42 U.S.C. § 3604(b);

   c. The making of statements with respect to the rental of dwellings that indicate a preference, limitation, or discrimination based on sex, in violation of Section 804(c) of the FHA, 42 U.S.C. § 3604(c); and

   d. Coercion, intimidation, threats or interference with persons in the exercise or enjoyment of, or on account of their having exercised or enjoyed, their rights under Section 804 of the Fair Housing Act, in violation of Section 818 of the FHA, 42 U.S.C. § 3617.

90. Plaintiffs have been injured by the discriminatory conduct of Defendants. Plaintiffs are "aggrieved persons" as defined in 42 U.S.C. § 3602(i) and have suffered damages as a result of Defendants' conduct.

91. Defendants' actions were willful and/or taken in reckless disregard for the civil rights of Plaintiffs.

## COUNT TWO

**Violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution--42 U.S.C. § 1983**
**(All Plaintiffs Against Quantay Oliver)**

92. Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 to 86 above.

93. Defendant Oliver's conduct, through his actions as described herein, constitutes affirmative acts of quid pro quo harassment. On the basis of sex, Defendant has made unwelcome requests or demands to engage in sexual conduct where submission to the request or demand, either explicitly or implicitly, is made a condition related to a tangible housing benefit or privilege.

94. Defendant's conduct, through his actions and those of his agents as described herein, constitutes affirmative acts of hostile environment harassment. Defendant has engaged in unwelcome conduct that is severe and pervasive and motivated by sex.

95. These acts of discrimination on the basis of sex deprived Plaintiffs of their Fourteenth Amendment rights to Equal Protection of the laws, and these rights were violated by Mr. Oliver acting under color of state law.

96. Defendant's actions were willful and/or taken in reckless disregard for the civil rights of Plaintiffs.

Case 1:20-cv-00700-APM   Document 1   Filed 03/10/20   Page 18 of 19

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that the Court grant the following relief:

(1) enter a declaratory judgment finding that the foregoing actions of Defendants violate the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601, *et seq.*; and the Equal Protection Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983;

(2) enter a permanent injunction directing Defendants and their agents and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

(3) award compensatory damages to Plaintiffs in an amount to be determined by a jury that would fully compensate them for all damages that have been caused by the conduct of Defendants alleged herein;

(4) award punitive damages to Plaintiffs in an amount to be determined by a jury that would punish Defendant Oliver for the willful, wanton, and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

(5) award Plaintiffs their reasonable attorneys' fees and costs; and

(6) order such other relief as this Court deems just and equitable.

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all issues so triable as of right.

Respectfully submitted                                        Dated:  March 10, 2020

/s/  Megan Cacace
Megan Cacace (DC Bar No. 981553)
Yiyang Wu (DC Bar No. 1028799)
Tahir Duckett (DC Bar No. 242187)
RELMAN COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
Tel: (202) 728-1888
Fax: (202) 728-0848
mcacace@relmanlaw.com
ywu@relmanlaw.com
tduckett@relmanlaw.com

*Attorneys for Plaintiffs*