UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|   |   |
|---|---|
| BELINDA MYERS & WANDA THOMAS,   ) | |
| ) | |
| Plaintiffs,   ) | |
| ) | |
| v.   ) | Civil Action No. 20-cv-700 (APM) |
| ) | |
| DISTRICT OF COLUMBIA HOUSING   ) | |
| AUTHORITY et al.,   ) | |
| ) | |
| Defendants.   ) | |

## MEMORANDUM OPINION

### I.

Plaintiffs Belinda Myers and Wanda Thomas are residents of James Creek, a property in the District of Columbia managed by Defendant District of Columbia Housing Authority ("DCHA"). They assert that, over a period of years, they have been sexually harassed by the complex's resident manager, Defendant Tifaqur Quantay Oliver, an employee of DCHA. They claim to have endured a wide spectrum of demeaning conduct. Most egregiously, Plaintiffs assert that Oliver offered to help both women avoid eviction if they agreed to have sex with him; attempted to grab their genitals; made vulgar and explicit comments; and offered to pay Plaintiffs for sex on numerous occasions.

Plaintiffs filed this action to hold Oliver and DCHA to account for Oliver's behavior. Both Plaintiffs assert quid pro quo and hostile environment harassment claims under the Fair Housing Act ("FHA") against each Defendant. Plaintiffs also advance a claim against Oliver under 42 U.S.C. § 1983 for violating their Fourteenth Amendment rights to equal protection of the laws. Each Plaintiff has testified under oath to a litany of indignities that she suffered at the hands of

Oliver. Still, Defendants insist they are entitled to judgment as a matter of law. DCHA Mot. for Summ. J., ECF No. 69, [hereinafter DCHA's Mot.]; Def. Oliver's Mot. for Summ. J., ECF No. 74, [hereinafter Oliver's Mot.].[1]

As discussed below, Plaintiffs proffer sufficient evidence for a jury to find that Oliver engaged in quid pro quo and hostile environment sexual harassment, that DCHA is vicariously liable for his actions, and that Myers's hostile environment claim is not time barred. The court therefore denies Defendants' motions as to Plaintiffs' FHA claims.[2] Oliver did not move for summary judgment on Plaintiffs' Section 1983 claim, so that cause of action will proceed, as well.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A material fact is one that is capable of affecting the outcome of the litigation, and a genuine dispute exists when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In assessing a motion for summary judgment, the court looks at the evidence in the light most favorable to the nonmoving party and draws all justifiable inferences in that party's favor. *Id.* at 255.

"To defeat a motion for summary judgment, the nonmoving party must offer more than mere unsupported allegations or denials." *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 17 (D.D.C. 2011). Its opposition must be "supported by affidavits, declarations, or other competent

---

[1] Oliver essentially adopts all the arguments made by DCHA. See Oliver's Mot., Mem. of P. & A. in Supp. of Oliver's Mot., ECF No. 74 [hereinafter Oliver's Mem.], at 3 n.1, 5 n.2.

[2] Plaintiffs argue the Amended Complaint states four separate claims under § 3404(a), § 3404(b), § 3404(c), and § 3617 of the FHA, and Defendants have only opposed their claim under § 3404(b). Pls.' Mem. of L. in Opp'n to DCHA Mot., ECF No. 76, [hereinafter Pls.' DCHA Opp'n], at 28–29. Defendants respond that the Amended Complaint does not plead multiple claims, only a single claim for quid pro quo harassment and hostile environment harassment. DCHA's Reply Mem. in Supp. of DCHA's Mot., ECF No. 86 [hereinafter DCHA's Reply], at 3–8. Because the court denies Defendants' motions, it will defer until trial the question of whether Plaintiffs have pleaded a one or more claims under the FHA.

evidence, setting forth specific facts showing that there is a genuine issue for trial." *Elzeneiny v. District of Columbia*, 125 F. Supp. 3d 18, 28 (D.D.C. 2015). Summary judgment, then, is appropriate when the nonmoving party fails to offer "evidence on which the jury could reasonably find for the [nonmovant]." *Anderson*, 477 U.S. at 252.

### III.

### A.

The court starts with Plaintiffs' quid pro quo harassment claims, which present a threshold dispute on the governing standards and elements. Defendants argue that the *McDonnell Douglas* framework used for quid pro quo claims under Title VII of the Civil Rights Act governs similar claims made under the FHA. DCHA Mot., DCHA's Mem. of P. & A. in Supp. of DCHA's Mot., ECF No. 69-2 [hereinafter DCHA's Mem.] at 10–11; Oliver's Mot., Mem. of P. & A. in Supp. of Oliver's Mot., ECF No. 74 [hereinafter Oliver's Mem.] at 5–7; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). They further contend that, because the *McDonnell Douglas* framework applies, Plaintiffs bear the initial burden to establish a prima facie case of quid pro quo discrimination. According to Defendants, the prima facie case consists of a showing:

> (1) that [Plaintiff] was a member of a protected class; (2) that she was subject to unwelcome sexual advances or requests for sexual favors; (3) that the harassment complained of was based on sex; (4) that her submission to unwelcome advances was an express or implied condition for receiving benefits or that her refusal to submit to the superior's sexual demands resulted in adverse consequences; and (5) that *respondent superior liability* exists.

DCHA's Mem. at 13 (citing *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 93 (D.D.C. 2007)). Defendants say Plaintiffs' proof fails on the fourth and fifth elements. *Id.* They also contend that Plaintiffs have not shown that DCHA's non-discriminatory reasons for moving to evict them are a pretext for discrimination. *Id.* at 29–31. For their part, Plaintiffs dispute that the

3

*McDonnell Douglas* framework has any application here. Because they rely on direct evidence of discrimination, they contend that the prima facie inquiry is irrelevant. Pls.' Mem. of L. in Opp'n to DCHA's Mot., ECF No. 76, [hereinafter Pls.' DCHA Opp'n], at 11–13.

Plaintiffs are correct. The Supreme Court has long held that "[t]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985); *Figueroa v. Pompeo*, 923 F.3d 1078, 1086 (D.C. Cir. 2019) (stating that the *McDonnell Douglas* "method of proof [applies] when [employees] have only circumstantial evidence of improper intent"). The Court reaffirmed that principle in *Swierkiewicz v. Sorema N.A.*, saying that "if a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a prima facie case." 534 U.S. 506, 511 (2002). Plaintiffs' proof therefore need not conform precisely to an "inflexible" formulation of a prima facie case. *See id.* at 512. The D.C. Circuit has gone even further and said that "when the plaintiff offers direct evidence of discriminatory intent, that evidence will generally entitle a plaintiff to a jury trial." *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013) (internal quotation marks omitted). Plaintiffs present direct evidence of sexual harassment, at a minimum, through their own testimonies. *See, e.g.*, Pls.' DCHA Opp'n, Ex. 1, Dep. of Belinda Myers Vol. I, ECF No. 76-4 [hereinafter Myers Dep. Vol. I], at 71:20–72:16, 73:17–74:18, 81:15–19; Pls.' DCHA Opp'n, Ex. 6, Dep. of Belinda Myers Vol. II, ECF No. 76-9 [hereinafter Myers Dep. Vol. II], at 115:8–116:4; Pls.' DCHA Opp'n, Ex. 23, Dep. of Wanda L. Thomas, ECF No. 76-26 [hereinafter Thomas Dep. Vol. I] at 86:5–9, 90:9–12, 96:2–18. The *McDonnell Douglas* test is thus inapplicable.

Ultimately, Defendants' assertion that *McDonnell Douglas* applies is less about burden shifting than it is their insistence that any claim of quid pro quo discrimination, whether proven by

direct or circumstantial evidence, must include evidence of an "adverse consequence" and some connection between the alleged harassment and a housing benefit. *See* DCHA's Mem. at 14–15 (asserting that "a tangible housing action is required" and that "Oliver had no role in initiating or pursuing an eviction proceeding or initiating or completing repairs of Myers's home"). And, they insist that Plaintiffs' evidence on both scores is lacking. *See id.* Plaintiffs do not question that they must supply proof of a connection, but they do contest the need to show an adverse action. Pls.' DCHA Opp'n at 15–20.

1.

*Connection between Harassment and Housing Benefits.* "Quid pro quo harassment occurs when housing benefits are explicitly or implicitly conditioned on sexual favors." *Honce v. Vigil*, 1 F.3d 1085, 1089 (10th Cir. 1993) (internal quotation marks omitted); *accord Fox v. Gaines*, 4 F.4th 1293, 1296 n.6 (11th Cir. 2021); *Quigley v. Winter*, 598 F.3d 938, 947 (8th Cir. 2010). To survive summary judgment then, Plaintiffs must present sufficient evidence for a jury to find that Oliver "either explicitly or implicitly" conditioned housing benefits on sexual favors. Plaintiffs easily have met that burden.

Myers alleges two instances of quid pro quo harassment. Myers testified that when she was in her building's rental office discussing her overdue rent payments with another DCHA employee, Oliver suggested he could get DCHA "off [her] back if [she] was to sleep with him." Myers Dep. Vol. I. at 167:7–168:1; *see also* Pls.' DCHA Opp'n, Ex. 5, Pl. Myers's Resps. to Def. DCHA's First Set of Interrogs., ECF No. 76-8, [hereinafter Myers Interrog.], at 20. She further testified that around 2018, when Oliver came to her home to assess the need for repairs to her kitchen floor due to mold and mildew, he told Myers that "he would send somebody to do the work order if [she] slept with him." Myers Dep. Vol. I at 114:12–18, 116:11–117:9; *see also* Myers

Interrog. at 20.  Thomas says that in 2017 Oliver approached her in front of the Southwest Family Enhancement and Career Center and told Thomas he could help her avoid eviction proceedings if she agreed to have sex with him.  Pls.' DCHA Opp'n, Ex. 24, Pl. Thomas's Resps. to Def. DCHA's First Set of Interrogs., ECF 76-27 [hereinafter Thomas Interrog.], at 22–23; Thomas Dep. Vol. I at 96:2–18.  Reasonable jurors, taking all inferences in the light most favorable to Plaintiffs, could view these incidents as Oliver conditioning housing benefits on sexual favors.

Still, Defendants insist that Plaintiffs fail to make out a quid pro quo harassment claim because they lack proof that Oliver had actual authority to influence the eviction process, or that he had anything to do with Myers's repairs.  DCHA's Mem. at 14–15; DCHA's Reply Mem. in Supp. of DCHA's Mot., ECF No. 86 [hereinafter DCHA's Reply], at 13.  But Defendants' understanding of this element of proof is too narrow.  A person may engage in quid pro quo harassment if he uses "his *apparent* or actual authority to extort sexual consideration from an employee."  *Henson v. City of Dundee*, 682 F.2d 897, 910 (11th Cir. 1982) (emphasis added).  In such case, the person "uses the means furnished to him by the employer to accomplish the prohibited purpose."  *Id.; accord Wilson v. Muckala*, 303 F.3d 1207, 1221 (10th Cir. 2002) (holding that the trial court properly refused to allow amendment of complaint to add quid pro quo harassment where the harasser lacked "actual or apparent authority over" the plaintiff); *Nichols v. Frank*, 42 F.3d 503, 509 (9th Cir. 1994) (citing *Henson*, 682 F.2d at 910), abrogated on other grounds by *Hudson v. Tahoe Crystal Bay, Inc.*, 191 F.3d 460 (9th Cir. 1999).  Here, there is record evidence from which a reasonable jury could conclude that Oliver, at a minimum, exercised apparent authority in connection with evictions and repairs.  For one, Oliver was the manager for the James Creek property.  The position's job description includes among a housing manager's duties "coordinat[ing] eviction actions initiated by [DCHA]," "[c]oordinat[ing] the maintenance

6

and repair of all property buildings, grounds, utilities, fixtures, and interior and exterior structures," and "[r]eceiv[ing] and processing tenant complaints/requests for repair and maintenance of inoperative, damage [sic] and/or broken fixtures, equipment, appliances, etc." DCHA's Resp. to Pls.' Statement of Material Facts, ECF No. 87, [hereinafter DCHA's Resp. to Pls.' SOMF], ¶ 24; Pls.' Mem. of L. in Opp'n to Def. Oliver's Mot., ECF No. 78, Ex. 33, DCHA Position Description, ECF No. 78-36, at 1–2.  The evidence shows that Oliver played some role in Thomas's eviction process, including serving the notice of eviction on her.  *Id.* ¶¶ 23, 27.  The record also shows Oliver came to Myers's home to inspect it regarding her mold and mildew complaints.  *Id.* ¶ 14.  These facts, viewed in the light most favorable to Plaintiffs, suffice to establish that Plaintiffs reasonably could have viewed Oliver as having apparent authority with respect to evictions and repairs.

Defendants also repeatedly characterize Plaintiffs' testimony as "self-serving," seemingly to suggest it is entitled to less weight.  *See, e.g.*, DCHA's Reply at 1, 13.  But whether Plaintiffs' testimony is to be believed is a question for the jury, not the court.  "Even where a party-witness's testimony may be impaired by party self-interest, it is ordinarily the role of the jury—not the court on summary judgment—to discount it accordingly."  *Trant v. Murray*, No. 20-cv-1457 (APM), 2022 WL 670824, at *4 (D.D.C. Mar. 5, 2022) (internal quotation marks omitted) (citing *Johnson v. Perez*, 823 F.3d 701, 710 (D.C. Cir. 2016)).

### 2.

*Adverse Consequence.*  The parties contest whether a plaintiff must endure an adverse housing consequence to sustain a quid pro quo harassment claim.  Defendants' position relies on Title VII case law.  DCHA's Mem. at 13–15 (citing *Gary v. Long*, 59 F.3d 1391, 1395 (D.C. Cir. 1995) (holding that a Title VII plaintiff had failed to make out a quid pro quo harassment claim

where the supervisor did not carry out threats of adverse job consequences if plaintiff did not submit to sexual propositions). Plaintiffs, on the other hand, urge the court to look to the United States Department of Housing and Urban Development's ("HUD") 2016 Final Rule ("Final Rule"), which sought to "formalize[] standards for evaluating claims of 'quid pro quo harassment' and 'hostile environment harassment'" under the FHA. Pls.' DCHA Opp'n at 10–11; Quid Pro Quo and Hostile Environment Harassment Under the Fair Housing Act, 81 Fed. Reg. 63054-01 (Sept. 14, 2016). The Final Rule defines "quid pro harassment" to mean

> an unwelcome request or demand to engage in conduct where submission to the request or demand, either explicitly or implicitly, is made a condition related to: The sale, rental or availability of a dwelling; the terms, conditions, or privileges of the sale or rental, or the provision of services or facilities in connection therewith; or the availability, terms, or conditions of a residential real estate-related transaction.

24 C.F.R. § 100.600(a)(1) (2021). The Final Rule's definition of "quid pro quo harassment" notably makes no reference to a requisite adverse housing consequence. When it promulgated the Final Rule, HUD emphasized that rulemaking was necessary to demarcate "differences between the Fair Housing Act and Title VII, and between harassment in the workplace and harassment in or around one's home." 81 Fed. Reg. at 63054.

The court thinks that the HUD definition of quid pro quo harassment applies in the FHA context. The Supreme Court has held that HUD's "construction [of the FHA] is entitled to great weight," *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 210 (1972), and that HUD's interpretation is afforded *Chevron* deference, *see Meyer v. Holley*, 537 U.S. 280, 287–88 (2003). Defendants have not argued otherwise. Instead, they contend that "[r]eliance on Title VII is the only way to get to the conclusion that plaintiffs may bring any *quid pro quo* or hostile environment sexual harassment claims at all." DCHA's Reply at 6–7. But that, of course, is not correct. Title

8

VII does not supply the quid pro quo harassment claim in the housing context; the FHA itself does. True, federal courts have interpreted the FHA in light of Title VII. *See, e.g.*, *Fox*, 4 F.4th at 1296. But it does not follow that an FHA claim "reli[es]" on Title VII or that there can be no daylight between the two. Defendants concede as much when they do not contest that the Final Rule's relaxed standard for vicarious liability for hostile environment claims applies here, and not Title VII's. *See* DCHA's Mem. at 20, 24–25. Thus, at this stage, the court can assume that HUD's definition of quid pro quo harassment is entitled to *Chevron* deference and governs Plaintiffs' claims. Plaintiffs therefore are not required to prove up an adverse housing consequence to make out their FHA quid pro quo harassment claim.³ Plaintiffs' quid pro quo claims therefore survive summary judgment.

### B.

The court turns now to Plaintiffs' hostile environment harassment claims. "Whether hostile environment harassment exists depends upon the totality of the circumstances." 24 C.F.R. § 100.600(a)(2)(i) (2021). The factors to consider include the "nature of the conduct, the context in which the incident(s) occurred, the severity, scope, frequency, duration, and location of the conduct, and the relationships of the persons involved." *Id.* The inquiry is whether "the harassment was sufficiently severe or pervasive so as to interfere with or deprive [a plaintiff] of her right to use or enjoy her home." *Quigley*, 598 F.3d at 946–47. Harassment occurring in the "intimate context of [a plaintiff's] home and security" is arguably more severe than in the workplace. *West v. DJ Mortgage, LLC*, 271 F. Supp. 3d 1336, 1354–55 (N.D. Ga. 2017). Thus,

---

³ Even if the court were required to track Title VII caselaw, a recent D.C. Circuit decision casts doubt on whether an adverse consequence is still required to make out a quid pro quo harassment claim under Title VII. *See Chambers v. District of Columbia*, 35 F.4th 870, 872 (D.C. Cir. 2022) (en banc) (overruling *Brown v. Brody*, 199 F.3d 446 (D.C. Cir. 1999), and holding that employees asserting disparate treatment claims under Title VII no longer need to establish "objectively tangible harm").

9

to survive summary judgment, Plaintiffs must show that there are genuine issues of material fact as to whether Oliver's alleged harassment was "severe or pervasive" enough to create a hostile housing environment. The court finds that Plaintiffs have met their burden.

In addition to her quid pro quo allegations, Myers makes the following time-specific allegations against Oliver: (1) in 2011, when he was a housing manager at Benning Terrace,[4] Oliver told Myers that he heard she had "that good shit," which Myers interpreted as a sexual reference, DCHA's Resp. to Pls.' SOMF ¶ 4; Myers Dep. Vol. I at 67:2–15; 69:17–20; 70:12–20; (2) in 2011, Oliver walked Myers to her home to assess the need for a repair, got close behind her and "said something to the effect of 'you're supposed to have that good shit' and reached out as though attempting to grab her buttocks," Myers Interrog. at 20; Myers Dep. Vol. I. at 132:20–133:4; Myers Dep. Vol. II at 115:8–116:4; (3) weeks later, while Myers was walking towards a bus stop, Oliver got "physically close to her" and asked when the two were going to "link up," which Myers interpreted as a proposition, Myers Interrog. at 20; (4) "around 2013 or 2014, Myers went to the rental office to ask about a repair, and Oliver stated that he would pay her $150 if she would have sex with him," Myers Interrog. at 20; Myers Dep. Vol. I at 145:12–146:5, 167:7–168:1; (5) in 2018, Oliver "summoned" Myers to the rental office under the pretense of signing paperwork, and when she arrived he "reached for [her genitals]," said he wanted to "see how fat [her] pussy is," and made references to the size of his penis, Myers Dep. Vol. I at 101:18–102:11; Myers Interrog. at 20–21. Additionally, Myers alleges generally that Oliver's harassment continued for years and that he made sexual comments to her so frequently that she "couldn't keep

---

[4] Defendants argue that Oliver was not a DCHA employee in 2011, so DCHA cannot be held vicariously liable for his actions that year. *See* DCHA's Reply at 14. But DCHA's factual support for that contention is an interrogatory response in which it identifies Oliver's job titles from *2012* through the present. *See id.* (citing DCHA's Reply, Ex. C, ECF No. 86-3, at 3). The interrogatory response makes no representation about Oliver's employment status in 2011 (perhaps because the interrogatory itself did not ask for his job title in 2011). *See id.* It is therefore not a settled fact whether Oliver was a DCHA employee in 2011.

count," Myers Dep. Vol. I at 132:20–133:11, offered to pay her for sex "over four or five times," *id.* at 98:22–99:3, and offered to take her to a casino or hotel to "hook up," *id.* at 146:4–148:11.

In addition to her quid pro quo allegations, Thomas alleges that Oliver: (1) told Thomas she looked "how he like[d] his woman to look" and made a comment about "how fat [her] pussy looked," Thomas Interrog. at 23; Thomas Dep. Vol. I at 90:9–12; (2) accused Thomas of being sexually promiscuous, Thomas Interrog. at 23; Thomas Dep. Vol. I at 96:2–18; (3) tried to lure Thomas into his office several times, Thomas Interrog. at 24; (4) stood outside her bedroom window and watched her for about five minutes, Pls.' DCHA Opp'n, Ex. 26, Continued Dep. Wanda Thomas, ECF No. 76-29, [hereinafter Thomas Dep. Vol. II] at 42:1–43:3; (5) made "vulgar and explicit comments," including "sexual type sounds, grunts, or gestures at her to suggest he was interested or aroused," Thomas Interrog. at 23; (6) offered to use points to get hotel rooms and to lock the door of the rental office while they had sex, *id.*; and (7) propositioned her on several occasions, *id.* at 22–23; Thomas Dep. Vol I at 100:7–101:22. Thomas testified that she felt Oliver was stalking her "[a]t my home, coming out of my home, coming out of the rec center, the resource center." Thomas Dep. Vol. II at 40:11–20.

Defendants vehemently deny that Oliver engaged in any such behavior and, once more, characterize Plaintiffs' allegations as "self-serving." DCHA's Reply at 15–16. But, of course, whether these incidents in fact occurred is for the jury to decide. Defendants also make much of the fact that Myers could not specify harassing incidents occurring from 2012 to 2016. *See id.* at 14. But she also testified that she could not "pinpoint" the time of some of the incidents. Pls.' DCHA Opp'n, Pls.' Resp. to DCHA's Statement of Undisputed Material Facts, ECF No. 76-3, ¶ 65. A jury will have to determine whether Oliver's alleged acts towards Myers were sufficiently pervasive (or severe) to make out a hostile housing environment claim.

11

C.

DCHA separately contests whether Plaintiffs have marshalled sufficient evidence to hold it either directly or vicariously liable for Oliver's actions. DCHA's Mem. at 21–28. The parties agree that the Final Rule's definitions for direct and vicarious liability apply. *See* DCHA's Mem. at 20; Pls.' DCHA Opp'n at 33. Because the court holds that there is a genuine dispute of fact as to whether DCHA is vicariously liable for Oliver's action, the court need not discuss DCHA's arguments for why it is not directly liable.

Under the Final Rule, "[a] person is vicariously liable for a discriminatory housing practice by the person's agent or employee, regardless of whether the person knew or should have known of the conduct that resulted in a discriminatory housing practice, consistent with agency law." 24 C.F.R. § 100.7(b) (2021). Under agency law, a principal is vicariously liable for actions taken within the agent's scope of employment, and for actions taken outside the scope of employment when the agent is "aided in accomplishing the tort by the existence of the agency relationship." *Vance v. Ball State Univ.*, 570 U.S. 421, 428 (2013) (internal quotation marks omitted). Therefore, although sexual harassment is deemed to fall outside the scope of employment, *see Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759 (1998), an employer still can be held liable under common law agency principles where "the agent's position facilitates the consummation of the [conduct], in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him." *Gary*, 59 F.3d at 1397 (D.C. Cir. 1995) (quoting Restatement (Second) of Agency § 261 cmt. a) (Am. L. Inst. 1958).[5]

---

[5] The court recognizes that *Gary* is a Title VII case decided before *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), which established the vicarious liability standard for hostile environment cases under Title VII. Nevertheless, *Gary* cites with approval to the common law standard of vicarious liability, which would appear to govern vicarious liability under the FHA.

DCHA argues it cannot be held vicariously liable for Oliver's conduct because Oliver was acting outside the scope of employment and was not aided in accomplishing the tort by the existence of the agency relationship. DCHA's Mem. at 25. It further insists that Oliver did not have the actual or apparent authority to evict tenants, increase rent, or make repairs. *Id.* at 25–28.

But as already discussed above, there is a genuine dispute of material fact as to whether Oliver, at least, had apparent authority with respect to matters of eviction and repair. *See supra* at 6–7. Further, the question of whether Oliver's alleged harassment of Plaintiffs was aided by the agency relationship with DCRA is better left to the jury. *Cf. Lyon v. Carey*, 533 F.2d 649, 655 (D.C. Cir. 1976) ("It is, then, a question of fact for the trier of fact, rather than a question of law for the court, whether the assault stemmed from purely and solely personal sources or arose out of the conduct of the employer's business."); *DBI Architects, P.C. v. Am. Express Travel-Related Servs. Co.*, 388 F.3d 886, 894 (D.C. Cir. 2004) (recognizing that the question of "when apparent authority arose" might be a jury question). The court therefore rejects DCHA's attempt at this juncture to avoid being held vicariously liable for Oliver's acts.

### D.

Separately, Oliver argues that claims made by Myers before 2018 are barred by the FHA's two-year statute of limitations and should not be considered as part of her hostile environment harassment claim. Oliver's Mem. at 8–10. Oliver's argument is misguided. What matters is that at least one incident occurred within the statutory period. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) ("It does not matter . . . that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."); *Havens Realty Corp. v.*

*Coleman*, 455 U.S. 363, 380–81 (1982) ("[W]here a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within [two years] of the last asserted occurrence of that practice."). The instant complaint was filed on March 10, 2020. *See* Compl. & Jury Demand, ECF No. 1. Thus, so long as one incident occurred after March 10, 2018, Myers's hostile environment harassment claim is not time barred.

Myers testified to two incidents occurring in 2018, though she did not specify the dates of those events. DCHA's Resp. to Pls.' SOMF ¶¶ 7–8. Oliver has not presented any evidence that either of these events occurred before March 10, 2018. Accordingly, taking all inferences in Myers's favor, as the court must do at this stage, the court finds that genuine issues of material fact preclude a finding of summary judgment as to the timeliness of Myers's hostile environment claim.

### IV.

For the foregoing reasons, the court denies Defendants' motions for summary judgment. The parties shall appear for a remote status conference to discuss further proceedings on September 16, 2022 at 2 p.m.

Dated: August 29, 2022

Amit P. Mehta
United States District Judge